UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                                                                             Chap. 11
                                                                                         Case No. 14-13406 (MG)
**Ashley River Consulting, LLC,**

                          **Debtor.**
-----------------------------------------------------------X
In re:                                                                             Chap. 11
                                                                                         Case No. 14-13407 (MG)
**Emerald Investments, LLC,**

                          **Debtor.**
-----------------------------------------------------------X

### DECLARATION PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4

STATE OF CONNECTICUT           )
                                                     ) ss.:
COUNTY OF FAIRFIELD             )

STUART LONGMAN, declares under the penalty of perjury, pursuant to 28 U.S.C. 1746 as follows:

1.  I am the Trustee of the Gayla Longman Family Irrevocable Trust u/t/d 1/2010, the sole member of Debtor Emerald Investments, LLC.  In turn, Debtor Emerald Investments, LLC is the 80% member of Debtor Ashley River Consulting, LLC.  The Debtors Emerald Investments, LLC and Ashley River Consulting, LLC shall be referred to herein collectively as the "Debtors".

2.  Unless otherwise stated herein, I am personally familiar with the facts and circumstances as recited herein.

3.  On December 15, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  As discussed in more detail herein, the Debtors sought protection under the Bankruptcy Code as a

result of a pending foreclosure proceeding that threatened to work a forfeiture of Emerald Investments, LLC's multi-million investment in an entity referred to as Ashley River Properties II, LLC, resulting in a windfall to and for the sole benefit of Emerald's co-member, Kriti Ripley, LLC.

4.  These bankruptcy filings are intended to prevent the forfeiture of Emerald's valuable assets through a bankruptcy sale and reorganization process that will inure to the benefit of all of the Debtors' creditors, and not simply Kriti Ripley, LLC.

## EVENTS LEADING TO THE BANKRUPTCY FILINGS

### A.  Ashley River Properties II, LLC

5.  Ashley River Properties II, LLC ("ARP II"), a South Carolina, member managed limited liability company, owns and developed a marina and valuable real estate along a riverfront site on the Ashley River in the City of Charleston known as Ripley Light Yacht Club Marina and Condominiums (the "Ripley Light Project"). The Ripley Light Project currently has about 87 wet slips and, on March 30, 2012, ARP II received a permit from the Army Corps of Engineers to add an additional 186 wet slips, which would expand the marina by more the twice its current size.

6.  At its inception, ARP II was wholly owned by Emerald. ARP II and a separate entity owned by Emerald – Ashely River Properties I – were initially jointly involved in developing the project. Emerald initiated the project and was its developer and manager. In 2003, ARP II turned to an outside investor, Kriti Ripley, LLC ("Kriti"), to provide additional financial assistance to the company. Emerald and Kriti subsequently entered into contracts under which they agreed to carry on the project through a joint venture.

7. Kriti paid $1.25 million for its interest in ARP II, and Emerald's initial capital contribution to ARP II was $2.5 million. Emerald is currently a 70% member in ARP II. Kriti is currently a 30% member in ARP II. Emerald currently estimates that ARP II's property is worth approximately $30 million. Although Kriti has yet to provide an estimate of the property's value, there is no dispute that the property is valuable and worth in the tens of millions of dollars. Prior appraisals of ARP II's property resulted in valuations ranging from $17.25 million to $24.53 million, although the property has not since been re-appraised to reflect the recovery of the real estate market and the additional value resulting from the permit granted to expand the marina.

B. **Disputes Arise Between Emerald And Kriti**

8. In 2004, a dispute arose between Emerald and Kriti involving the project and their respective rights under the contracts. On January 14, 2005, Kriti terminated the development agreement by and among the parties, alleged default under the operating agreement, and seized exclusive management and operational control over ARP II from Emerald. Kriti has had complete control over the management and operations of ARP II since January 14, 2005.

9. On or about March 23, 2005, Kriti and ARP II filed for arbitration in New York and sought damages for alleged defaults under the operating agreement and the issuance of an order forfeiting Emerald's financial and voting interests in ARP II. On or about October 31, 2005, the New York arbitrators rendered their written decision (the "2005 Arbitration Award") finding that Emerald had defaulted under the operating agreement and awarding Kriti damages. The panel, however, rejected Kriti's claim that Emerald forfeited its entire interest in ARP II. The panel found that Emerald's defaults caused the forfeiture of its "voting rights" in ARP II, but

not its financial interest in ARP II. As a result, Emerald has no voting rights in ARP II, but remains a 70% member therein.

10. The New York Supreme Court later affirmed the findings of the New York arbitrators and docketed its judgment on April 2, 2008, which awarded a total of $1,184,581.72 to Kriti, including $194,832.58 in pre-judgment interest.

11. On or about April 29, 2008, Kriti filed an action in the Court of Common Pleas, Ninth Judicial Circuit, State of South Carolina, to domesticate the New York judgment. On October 17, 2008, Kriti also made an *ex parte* application for and was granted a charging order against Emerald's distributable interest in ARP II pursuant to applicable South Carolina law. The charging order, as modified on or about February 6, 2009, required ARP II (which is completely controlled by Kriti) to divert or pay over to Kriti any distributions from ARP II that would otherwise be payable to Emerald.

12. As a result of continuing conflicts between Emerald and Kriti involving ARP II's management, on or about January 22, 2010, Emerald filed another demand for arbitration in New York, and on October 28, 2010 the New York arbitrators issued their written decision confirming that Emerald still owns 70% of ARP II, finding that a 2005 capital call made by Kriti was defective and did not dilute Emerald's interest, and ordering Kriti to pay $59,527.74 to Emerald. The arbitrators, however, refused to dissolve ARP II.

C.    **The Foreclosure Action**

13. On or about February 1, 2011, Kriti and ARP II filed a motion in South Carolina state court seeking to foreclose on its charging order lien. Kriti alleged that it should be allowed to foreclose on Emerald's "distributable interest" in ARP II on the grounds that ARP II, which is

completely controlled by Kriti, has not made any distributions under the charging order to satisfy the money judgment. Emerald opposed the motion.

14. On June 10, 2011, the South Carolina state court entered an order denying Kriti's and ARP II's motion to foreclose on the charging lien order. On appeal, the South Carolina Supreme Court reversed and remanded the case to the lower court to proceed with the foreclosure sale "through the normal foreclosure process". On April 28, 2014, Kriti filed a supplemental motion to schedule a foreclosure sale and on July 15, 2014, the court entered an order granting Kriti's motion.

15. On July 25, 2014, Emerald moved to alter and/or amend the July 15, 2014 order. In granting the relief requested by Emerald, the court noted that the typical foreclosure sale process in South Carolina is conducted by the sheriff who is charged with selling the property to the highest bidder at auction. On the other hand, the court noted that courts "zealously ensure that judicial sales are openly and freely conducted and nothing is allowed to chill the bidding". In this regard, the court found:

> In this case, Kriti completely controls ARP II even though it is only a 30% financial member. Emerald has no voting or management rights in the company. ARP II owns a valuable marina and riverfront real estate on the Ashley River. ARP II's real estate holdings are its only assets of any significance. Prior appraisals of ARP II's property resulted in valuations ranging from $17.25 million to $24.53 million, thus it appears that ARP II as a company has considerable equity. Nevertheless, Kriti has made no distributions from ARP II since taking control of ARP II over nine years ago.
>
> Because of provisions in the LLC Act and the ARP II Operating Agreement, any purchaser or transferee of Emerald's interest at a foreclosure sale receives only the "distributional interest" and cannot exercise any control over ARP II's management and business, unless Kriti consents.
>
> \*    \*    \*    \*    \*
>
> Because of these restrictions on the rights of any purchaser at a foreclosure sale, there will be no readily available market for sale of Emerald's distributional interest. It is unreasonable to expect that anyone (besides Kriti) will bid to

purchase Emerald's distributional interest at a Sheriff's sale conducted on the courthouse steps following the procedures applicable to personal property when the purchaser will have no voting or management rights and ARP II has not made any distributions to its members in over nine years. A foreclosure by Sheriff's sale will ensure that Kriti is the only bidder and it will acquire Emerald's $2.5 million capital contribution and equity in ARP II at a price much less than fair value.

16. Furthermore, Kriti had previously advised the court that it had no intention of waiving its rights to recover any deficiency claim against Emerald should the foreclosure sale fail to generate enough proceeds to satisfy the judgment in full. Consequently, the court further noted that "if Kriti is the high bidder at the Sheriff's sale, which is a practical certainty, this process most likely will result in a considerable judgment remaining against Emerald even though Kriti will have acquired all of Emerald's interest in ARP II (including its $2.5 million capital contribution) and completely captured its 70% equity stake in the project, which is worth millions of dollars. This process would likely result in a considerable windfall to Kriti."

17. Accordingly, the state court ordered that the property be auctioned pursuant to the procedures applicable to foreclosures of real property, as opposed to personal property, and an auction was scheduled for December 16, 2014.

**ASHLEY RIVER CONSULTING, LLC AND THE BANKRUPTCY FILINGS**

18. As noted, in light of the facts that (i) Kriti completely controls ARP II; (ii) Emerald has no voting or management rights in the company; and (iii) Kriti has made no distributions in the nine years since it assumed control over the company, any forced sale of Emerald's distributable interest in ARP II will likely result in a considerable windfall to Kriti, to the detriment of Emerald and its substantial creditor body.

19. These bankruptcy proceedings are intended to prevent the forfeiture of Emerald's interests in ARP II, through the redemption of Emerald's financial interest in

ARP II, the reinstatement of Emerald's voting rights in ARP II and, potentially, a sale of Emerald's interest in ARP II pursuant to a bankruptcy sale process that ensures competitive bidding as opposed to a "chilled bidding" process outside of bankruptcy.

20. In this regard, by agreement dated as of December 1, 2014 by and between Emerald and Ashley River Consulting, LLC, Ashley River Consulting, LLC has agreed, subject only to definitive documentation, to redeem Emerald's financial interest in ARP II by satisfying the judgment against Emerald and in favor of ARP II, and assuming a proportionate amount of Emerald's unsecured debts. Ashley River Consulting, LLC has also agreed to purchase Emerald's membership interests in ARP II upon the occurrence of an event of dissociation (as that term is used in the ARP II operating agreement)

21. To the extent that Emerald is able to realize the full value of its interests in ARP II, it is anticipated that all of the Debtors' creditors will be paid in full pursuant to a chapter 11 plan of reorganization.

## **LOCAL BANKRUPTCY RULE 1007-2**

22. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), a list containing the names of the Debtors' twenty largest unsecured creditors has been filed in each of the Debtor's respective cases.

23. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), a list containing the names of the Debtors' secured creditors has been provided in Schedule D to the Schedules of Assets and Liabilities filed in each of the Debtor's respective cases.

24. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), a summary of the Debtors' assets and liabilities is set forth in Schedules of Assets and Liabilities filed in each of the Debtor's respective cases.

25. Pursuant to Local Bankruptcy Rule 1007-2(a)(7), there are no securities of the Debtors that are publicly held.

26. Pursuant to Local Bankruptcy Rule 1007-2(a)(8), there is no property of the Debtor in the possession or custody of any public officer, receiver, trustee, pledgee, assignee of rents, liquidator, secured creditor, or agent of any such person.

27. Pursuant to Local Bankruptcy Rule 1007-2(a)(10), all corporate assets and books and records are located with the respective Debtor.

28. Pursuant to Local Bankruptcy Rule 1007-2(a)(11), all pending and threatened actions and proceedings against Emerald are listed in its Schedule of Financial Affairs. There are no pending or threatened actions or proceedings against Ashley River Consulting.

29. Pursuant to Local Bankruptcy Rule 1007-2(a)(12), management of the Debtors is conducted through their respective members.

30. Pursuant to Local Bankruptcy Rule 1007-2(b), the Debtors do not anticipate (i) any payroll expenses, (ii) making any payment to officers, directors or members, nor (iii) any receipts or disbursements (other than professional fees) in the 30 days following the Petition Date.

December 29, 2014

/s/ Stuart Longman
Stuart Longman