**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
In re:                                                                                    **NOT FOR PUBLICATION**

                                                                                          Chapter 11

ASHLEY RIVER CONSULTING, LLC,
                                                                                          Case No. 14-13406 (MG)


                            Debtor.
---------------------------------------------------------------X
In re:


                                                                                          Chapter 11

EMERALD INVESTMENTS, LLC,
                                                                                          Case No. 14-13407 (MG)


                            Debtor.
---------------------------------------------------------------X

**MEMORANDUM OPINION AND ORDER GRANTING (I) MOTION FOR APPROVAL**
**OF SALE PROCEDURES, AND (II) APPLICATION TO RETAIN BROKER**

*A P P E A R A N C E S:*

GAZES LLC
*Attorneys for Ian J. Gazes, as Trustee for*
*Ashley River Consulting, LLC and*
*Emerald Investments, LLC*
151 Hudson Street
New York, New York 10013
By:    Ian Gazes, Esq.

EMMET, MARVIN & MARTIN, LLP
*Attorneys for Kriti Ripley, LLC and*
*Ashley River Properties II, LLC*
120 Broadway, 32nd Floor
New York, New York 10271
By:    Thomas A. Pitta, Esq.

WHITE & WOLNERMAN, PLLC
*Attorney for the Gayla Longman Family*
*Irrevocable Trust*
950 Third Avenue, 11th Floor
New York, New York 10022
By:    David Y. Wolnerman, Esq.
         Randolph E. White, Esq.

SCHULTE ROTH & ZABEL LLP
*Attorney for Schulte Roth & Zabel LLP*
919 Third Avenue
New York, New York 10022
By:   David M. Hillman, Esq.
    Karen S. Park, Esq.
    Parker J. Milender, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court are two motions concerning the proposed sale of a parcel of real property located in South Carolina (the "Marina Property"), an asset indirectly owned in part by Debtor Emerald Investments, LLC ("Emerald") by virtue of its 70% non-voting membership interest in the entity that owns the Marina Property—non-debtor Ashley River Properties II, LLC ("ARP II").[1]  The motion to approve marketing, bidding, and sale procedures for a sale of the Marina Property (the "Sale Procedures Motion," ECF Doc. # 57),[2] was filed by Ian J. Gazes (the "Trustee"), as chapter 11 trustee of the Debtors,[3] ARP II, and Kriti Ripley, LLC ("Kriti," and together with ARP II, the "Creditors").[4]  The Trustee also filed an application to retain Colliers International Charleston, LLC ("Colliers") as commercial real estate broker in connection with

---

[1]    Emerald holds an 80% membership interest in its affiliated Debtor Ashley River Consulting, LLC ("ARC," and together with Emerald, the "Debtors").  ARC's remaining 20% interest is held by David A. Thomas ("Thomas"), the manager of each of the Debtors.  ARC has no meaningful assets or creditors.

[2]    Identical versions of all cited filings appear on the dockets of Case No. 14-13406 and Case No. 14-13407; however, their docket numbers differ.  For ease of reference, all citations to docket entries in this Opinion refer to the docket of Case No. 14-13407.

[3]    The United States Trustee (the "UST") filed a motion for entry of an order directing the appointment of a chapter 11 trustee (ECF Doc. # 38), which the Court granted over the Debtors' objection on March 16, 2015 (ECF Doc. # 45).  The Court's reasoning in support of its ruling is detailed in the *Memorandum Opinion and Order Directing the Appointment of a Chapter 11 Trustee in these Chapter 11 Cases* (the "Trustee Opinion," ECF Doc. # 54).

[4]    The Sale Procedures Motion is supported by the declarations of Davidson Williams (the "Williams Declaration," ECF Doc. # 61), a managing director of Kriti, and Ian J. Gazes (the "Gazes Declaration," ECF Doc. # 69), the Trustee.

2

the proposed sale (the "Broker Application," ECF Doc. # 75).[5] The Trustee (with the support of the Creditors) proposes to market and potentially hold an auction of the Marina Property in order to monetize Emerald's primary asset, its 70% non-voting membership interest in ARP II.

The Trustee asserts that a sale of the Marina Property along the lines proposed is the best means of unlocking the value of the Emerald's interest in ARP II for the benefit of Emerald's estate and its creditors. Absent a sale of the Marina Property, Emerald's membership interest in ARP II is relatively illiquid and has potentially little value because it carries no voting rights—Kriti holds the remaining 30% membership interest in ARP II and total voting control. As explained in more detail below, Kriti has been embroiled in approximately nine years of litigation with Emerald and its principal, Stuart Longman ("Longman"), over Emerald and Longman's diversion and misappropriation of ARP II's funds. This litigation resulted in judgments against Emerald and Longman for their misconduct and the forfeiture of Emerald's voting rights in ARP II.

An objection to the Sale Procedures Motion was filed by Emerald's sole owner, the Gayla Longman Family Irrevocable Trust (the "Longman Trust") (the "Longman Objection," ECF Doc. # 62). Longman is the sole trustee of the Longman Trust. An objection was also filed by Emerald's largest unsecured creditor, the law firm of Schulte Roth & Zabel LLP ("SRZ") (the "SRZ Objection," ECF Doc. # 66). SRZ's claim is based on unpaid legal fees for its representation of Emerald and Longman in litigation with Kriti. The Trustee and the Creditors (together, the "Proponents") filed an omnibus reply to the objections. (ECF Doc. # 57.)

The Court held a hearing on the Sale Procedures Motion on July 1, 2015, which was continued to July 7, 2015. On July 2, 2015, the Trustee filed the Broker Application. (*See* ECF

---

[5]   The Broker Application is supported by the affidavit of Peter Fennelly (the "Fennelly Affidavit," *id.* Ex. B).

3

Doc. # 75.) The Longman Trust filed an objection to the Broker Application. (ECF Doc. # 76.) On July 7, 2015, the Court held an evidentiary hearing on both motions and took the matters under submission.

In light of the lengthy history of obstruction and misconduct on the part of Longman, the Court views the Longman Trust's objections with a healthy degree of skepticism. The issue before the Court is whether the Trustee has exercised his sound business judgment in seeking approval of the proposed bidding procedures in connection with a sale of the Marina Property; the Court concludes that he has. The Trustee also appropriately exercised his business judgment in selecting the broker. For the reasons set forth below, the Court **GRANTS** the Sale Procedures Motion and the Broker Application.

## I.  BACKGROUND[6]

### A.  Emerald's History with the Creditors

Kriti and Emerald formed ARP II in 2003 for the purpose of developing the Marina Property. (Sale Proc. Mot. ¶ 5.) Upon forming ARP II, Kriti and Emerald entered into an operating agreement (the "Operating Agreement," Gazes Decl. Ex. A). (Sale Proc. Mot. ¶ 5.) Emerald currently holds a 70% membership (though non-voting) interest in ARP II. (*See id.* ¶¶ 5–6.) The remaining 30% membership interest in ARP II is held by Kriti (Tr. Op. at 3), and Kriti currently has total voting control over ARP II (*see* Sale Proc. Mot. ¶ 6).

Emerald and Kriti have been in disputes relating to the Operating Agreement and the Marina Property for over nine years. (Tr. Op. at 5.) According to Kriti, after it paid $1.25 million for its 30% interest in ARP II, Emerald and Longman diverted and misappropriated those funds. (*Id.*) Kriti filed an arbitration in March 2005, alleging defaults under the Operating

---

[6]    Certain of the background facts are taken from the Trustee Opinion, cited herein as "Tr. Op."

4

Agreement and seeking the forfeiture of Emerald's financial and voting rights in ARP II. (*Id.*) On October 31, 2005, the arbitration panel issued an award finding, among other things, that Emerald and Longman violated the Operating Agreement by misappropriating ARP II funds for the benefit of Longman and entities controlled by Longman. (*See id.*) In light of these breaches of contract, the arbitration panel held that Emerald forfeited all voting interests in ARP II but otherwise maintained its 70% ownership interest. (*Id.*)

On February 15, 2008, the Supreme Court of New York (the "New York State Court") affirmed this arbitration award and a separate June 22, 2006 arbitration award of damages to Kriti. (*Id.* at 6.) On March 27, 2008, the New York State Court issued a money judgment in the amount of $1,184,581.72 against Longman and Emerald, jointly and severally, in favor of Kriti and ARP II. (*Id.*) The judgment remains unsatisfied. (*Id.*)

On October 17, 2008, the Ninth Judicial Circuit sitting in Charleston, South Carolina issued a charging order perfecting a lien on Emerald's membership interest in ARP II for the judgment plus post-judgment interest. (*Id.*) Years later, on October 21, 2014, upon the motion of Emerald and Longman, the Court of Common Pleas of the County of Charleston, South Carolina (the "South Carolina State Court") entered an order requiring the foreclosure of Emerald's interest in ARP II to be conducted under South Carolina procedures for the foreclosure of real property rather than under procedures for the foreclosure of personal property. (*Id.*) The foreclosure of Emerald's membership interest was scheduled for December 16, 2014. (*Id.*) However, one day prior to the scheduled foreclosure sale, each of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code on December 15, 2014. (*Id.* at 7.)

5

### B.     Longman's History of Misconduct[7]

#### 1.     *Robert McKay's Judgment against Longman*

Robert McKay ("McKay") is listed as an unsecured creditor on each of the Debtors' bankruptcy schedules holding a purported contingent, unliquidated, and disputed claim in the amount of zero dollars.  (*Id.* at 9.)  In 1996, McKay obtained a judgment in the New York State Court against Longman, awarding McKay $1,261,546.86 in actual damages and interest, and $2,702,500 in punitive damages awarded as a result of the court's finding that Longman engaged in "affirmative fraud," "fraud by concealment," and "gross, wanton, and willful" misconduct.  (*Id.*)

On October 15, 2010, McKay commenced a second action against Longman, entities affiliated with Longman, including Emerald, and certain financial institutions in Connecticut state court.  (*Id.*)  By this action, McKay sought to enforce the 1996 money judgment against Longman.  (*Id.*)  Hudson City Savings Bank, a defendant in the action due to its involvement in the mortgage on Longman's personal residence, filed a motion for summary judgment that was denied.  (*Id.*)  In its opinion, the state court noted that Longman repeatedly transferred the title to his primary residence and had "ulterior motives" for obtaining a mortgage on the property, the transaction for which was of a "questionable nature."  (*Id.*)  Trial of McKay's action was scheduled for January 12, 2013.  (*See id.* at 10.)

#### 2.     *Sapphire Development LLC's Bankruptcy*

On the eve of trial of McKay's Connecticut state court action, Sapphire Development LLC ("Sapphire"), a limited liability company wholly owned by the Longman Trust, filed a

---

[7]     While Longman's prior actions are not directly pertinent to the subject of this Opinion, the Court summarizes Longman's history of misconduct and obstructionist tactics to put his objections to the pending motions into context.

voluntary chapter 11 petition in Connecticut bankruptcy court.[8] (*Id.* at 9–10.) McKay moved to dismiss the case or alternatively for abstention to permit his underlying Connecticut state court action to proceed. (*Id.* at 10.) The bankruptcy court granted the abstention portion of McKay's motion, finding that it appeared that Longman was attempting to frustrate McKay's efforts to enforce the 1996 money judgment against Longman. (*See id.*)

On November 6, 2014, the district court vacated the bankruptcy court's order on the ground that abstention was not the appropriate remedy and remanded the matter to the bankruptcy court. (*Id.*) In so ruling, the district court intimated that either dismissal of Sapphire's bankruptcy case or relief for McKay from the automatic stay would be more appropriate in light of the bankruptcy court's factual findings regarding Sapphire's motives. (*Id.*) The district court also suggested that the bankruptcy court may appropriately impose sanctions against Sapphire due to findings of bad faith. (*Id.*) On April 14, 2015, the bankruptcy court held an evidentiary hearing on the dismissal and lift stay portions of McKay's motion. (*See In re Sapphire Dev., LLC*, Case No. 13-50043, at 5 (Bankr. D. Conn. June 26, 2015) (order granting motion to dismiss).) The bankruptcy court granted McMay's motion to dismiss, finding that Sapphire's bankruptcy case was filed in bad faith. (*See id.* at 13.)

        3.      *60 Shelter Rock Associates, LLC's Bankruptcy*

60 Shelter Rock Associates, LLC ("Shelter Rock"), another limited liability company substantially owned by Longman, filed a voluntary chapter 11 petition in Connecticut bankruptcy court on February 11, 2014. (*See* Tr. Op. at 11.) Thomas executed Shelter Rock's bankruptcy petition and appeared on behalf of Shelter Rock with Longman at the meeting of

---

[8] As set forth in the Trustee Opinion, this was Sapphire's second bankruptcy filing. Its first bankruptcy filing in 2003 was not disclosed by Emerald in breach of the Operating Agreement, as discussed in the 2005 arbitration award in favor of Kriti. (*Id.* at 10 n.5.) According to Sapphire's schedules, Emerald and Longman were "co-debtors" of Sapphire in the 2003 bankruptcy case. (*Id.*)

7

creditors pursuant to section 341 of the Bankruptcy Code on February 12, 2015. (*Id.*) On February 27, 2015, Savings Bank of Danbury ("SBD"), a secured creditor of Shelter Rock, filed a motion to dismiss the bankruptcy case (*see* Motion to Dismiss, *In re Shelter Rock Associates, LLC*, Case No. 14-50217 (Bankr. D. Conn. Feb. 27, 2015), ECF Doc. # 100), and a motion for relief from the automatic stay to foreclose on a parcel of real property securing SBD's loan (*see* Motion for Relief from Automatic Stay, *In re Shelter Rock Associates, LLC*, Case No. 14-50217 (Bankr. D. Conn. Feb. 27, 2015), ECF Doc. # 98). In its motion to dismiss, SBD alleged that Longman, as principal of Shelter Rock, knowingly caused Shelter Rock to spend SBD's cash collateral without consent or court approval. (Tr. Op. at 11.) The motion also alleged that Longman violated the automatic stay because he had to reimburse the estate over $5,000 for prepetition expenses Shelter Rock paid after its petition date. (*See id.*)

After a hearing on SBD's motions, the bankruptcy court granted SBD relief from the automatic stay. (*In re Shelter Rock Assocs., LLC*, Case No. 14-50217 (Bankr. D. Conn. Apr. 21, 2015) (order granting motion for relief from stay).) SBD and Shelter Rock subsequently entered into a settlement agreement resolving SBD's claims, and Shelter Rock filed a motion to dismiss its case on the basis that it is unable to effectuate a substantial consummation of a confirmed chapter 11 plan. (*See* Motion to Dismiss, *In re Shelter Rock Assocs., LLC*, Case No. 14-50217 (Bankr. D. Conn. June 18, 2015), ECF Doc. # 139.) Shelter Rock's motion to dismiss is currently pending before the Connecticut bankruptcy court.

### C. The Debtors' Chapter 11 Cases

In Emerald's bankruptcy case, the Creditors asserted a secured claim against Emerald's membership interest in the amount of $1.7 million, which includes their money judgment against Emerald and Longman (affirmed by the New York State Court) and post-judgment interest. (Tr.

8

Op. at 8.) On February 5, 2015, the Creditors filed a motion to dismiss Emerald's chapter 11 case, or alternatively for relief from the automatic stay, arguing that Emerald filed its chapter 11 petition in bad faith. (*See generally* ECF Doc. # 22.) In their motion, the Creditors argued that ARP II's liabilities exceeded $14.6 million as of December 31, 2014. (*Id.* ¶¶ 14–16.) On February 17, 2015, Emerald filed an opposition to the Creditors' motion (ECF Doc. # 26), asserting that ARP II has a value in excess of $30 million. (*Id.* ¶ 35.) In their reply (ECF Doc. # 32), the Creditors argued that they conducted various appraisals of the Marina Property between 2007 and 2015; the most recent appraisal provided a $7.96 million estimated valuation of the Marina Property. (*See id.* ¶ 46.)

The Court held a hearing on the motion on February 24, 2015 and denied the motion without prejudice on the same day. (ECF Doc. # 36.) At the hearing, the Court directed the UST to investigate whether the appointment of a chapter 11 trustee in the Debtors' cases would be a more appropriate remedy. (*See* Tr. Op. at 8.) The UST filed a motion to appoint a chapter 11 trustee on March 4, 2015 (ECF Doc. # 38), which was contested by the Debtors (ECF Doc. # 43). The Court held a hearing on the March 16, 2015 and entered an order granting the UST's motion to appoint a chapter 11 trustee on the same day.[9] (ECF Doc. # 45.) The UST subsequently filed an application to appoint the Trustee (ECF Doc. # 47), which the Court approved on March 18, 2015 (ECF Doc. # 48).

### D. The Motions

By the Sale Procedures Motion, the Proponents seek the entry of an order approving proposed marketing, bidding, and auction procedures for the sale of the Marina Property free and

---

[9] On March 31, 2015, the Court issued the Trustee Opinion detailing the reasoning underlying its decision. (*See* Tr. Op. at 2–3.)

9

clear of all liens and encumbrances (the "Sale Procedures").[10] (Sale Proc. Mot. ¶ 11.) The Trustee also seeks to retain Colliers as commercial real estate broker in furtherance of the marketing and possible sale of the Marina Property. (*See* Broker App. ¶ 9.) The Proponents assert that any sale of the Marina Property will be conducted in accordance with their proposed joint chapter 11 plan of liquidation (the "Plan," ECF Doc. # 58.) (Sale Proc. Mot. at 1.) Under the proposed Plan, proceeds from a sale of the Marina Property will be used to satisfy administrative claims, including commissions payable to Colliers; the remaining proceeds will be used to satisfy all of ARP II's liabilities and then distributed in accordance with the terms of the Operating Agreement. (*Id.* ¶ 9.) The Proponents contend that the Operating Agreement provides that distributions shall: (i) first, repay each member's capital contributions; and (ii) second, be distributed to the members on a pro rata basis in proportion to their equity ownership. (*See* Reply ¶ 16 (citing Operating Agreement § 8.1).)

According to the Trustee, the only asset with potential value to Emerald's estate is its membership interest in ARP II. (Reply ¶ 1.) In order for Emerald to realize any benefit on account of this membership interest, the Marina Property must be sold in an amount that exceeds, among other things, the liabilities of ARP II. (*Id.* ¶ 2.) In the absence of a sale of the Marina Property, Emerald's non-voting interest in ARP II has no value. (*Id.*) Because Kriti has total voting control over ARP II, the Marina Property cannot be sold without Kriti's approval. (*Id.*)

---

[10] The Sale Procedures are set forth in detail in a proposed form of order filed by the Proponents (as revised, the "Proposed Order," ECF Doc. # 67, Ex. A).

10

Kriti has agreed to permit the Trustee to sell the Marina Property.[11] (*Id.* ¶ 3.) However, Kriti's authorization for the sale is conditioned on the Marina Property being sold at a price sufficient to satisfy ARP II's debts and a material portion of Kriti's judgment against Longman and Emerald. (*See id.* ¶¶ 3, 9.) Because a sale of the Marina Property at a price below these amounts would not generate sufficient proceeds payable to Emerald on account of its equity interest in ARP II, the Proponents have established an $18 million reserve price for the Marina Property (the "Strike Price"). (*See* Sale Proc. Motion ¶¶ 20–21.) While a sale of the Marina Property for the $18 million Strike Price would purportedly not satisfy ARP's debts and Kriti's judgment in full, the Proponents established the Strike Price at a lower amount to encourage bidders to participate in an auction of the Marina Property. (*See id.* ¶¶ 21–22.)

The Sale Procedures are briefly summarized as follows. Colliers, if retained, will issue a notice of the sale to potential purchasers within three days following the entry of the Proposed Sale Procedures Order and place advertisements for the sale in various outlets. (*See* Prop. Order ¶ 17.) Specifically, Colliers will market the Marina Property to potential bidders on the terms set forth in a proposed marketing plan (the "Marketing Plan," Broker App. Ex. D). (Prop. Order ¶ 17.) Potential bidders who execute a confidentiality agreement have an opportunity to participate in the diligence process, which will be coordinated by Colliers. (*See id.* ¶ 8.) Among other things, such potential bidders will be provided an offering memorandum for the Marina Property prepared by Colliers and access to a data room maintained by Colliers. (*See id.* ¶ 17.)

In order to participate in an auction of the Marina Property, a bidder must submit the following by September 2, 2015 at 4:00 p.m. (prevailing Eastern time) (the "Bid Deadline"): (1) an executed, binding purchase and sale agreement (a "PSA"), in a form acceptable to the

---

[11] Kriti has also agreed to provide funding for the administrative expenses of the Debtors' chapter 11 cases. (*See id.* ¶ 7.)

11

Proponents, on an as-is, where-is basis, free of contingencies, and with a cash purchase price of not less than the Strike Price; and (2) a cash deposit of not less than 10% of the purchase price. (*Id.* ¶ 6.) To constitute a "Qualified Bid", each such PSA must include: (i) confirmation that the offer is irrevocable until immediately after closing; (ii) evidence of available funds necessary to consummate the sale; (iii) a commitment to close the sale within no less than five days after the Court's entry of an order confirming the Plan; and (iv) evidence of corporate authority to enter into the sale. (*Id.* ¶ 7.) An auction will only proceed if more than one Qualified Bid is received by the Bid Deadline. (*Id.* ¶ 11.) If no Qualified Bids are received by the Bid Deadline, the Trustee will not conduct an auction; if only one Qualified Bid is received by the Bid Deadline, the Trustee will not conduct an auction but will seek approval to consummate the transaction. (*Id.* ¶ 10.) The auction, if held, will be conducted on September 8, 2015 at 10:30 a.m. (prevailing Eastern time). (*Id.* ¶ 11.)

### E. The Objections

The Longman Trust indicates that it does not generally object to a sale of the Marina Property (*see* Longman Obj. ¶ 1); however, it objects to the Sale Procedures Motion for a number of reasons, including that: (i) the Sale Procedures improperly provide the Trustee with too much authority to modify the Sale Procedures in his discretion (*see id.* ¶¶ 17–19), and to determine the highest and best bid (*see id.* ¶¶ 34–35); (ii) the Sale Procedures limit the universe of potential bidders by establishing an unduly short time for Colliers to market the Marina Property and for potential bidders to perform due diligence and obtain any necessary regulatory or corporate governance approval in connection with a bid (*see id.* ¶¶ 20–25); (iii) the Proponents should provide greater transparency regarding the sale process, including by providing the Longman Trust access to the diligence information to be provided to potential

12

bidders (*see id.* ¶¶ 36–38), and disclosing more information regarding distributions contemplated to be made from the sale proceeds (*see id.* ¶¶ 39–45). The Longman Trust also objects to the Sale Procedures on the basis that they effectively amount to a *suba rosa* plan of reorganization by dictating the terms of a plan, including the distributions to be made to creditors. (*See id.* ¶¶ 46–49.) Finally, the Longman Trust objects to the Sale Procedures, and the Broker Application, to the extent that the Trustee seeks to retain Colliers as commercial real estate broker. (*See id.* ¶¶ ) According to the Longman Trust, Colliers had previously unsuccessfully attempted to market the Marina Property and did not obtain any offers approaching the amount of the Strike Price. (*See id.* ¶¶ 26–30.) Therefore, the Longman Trust is skeptical that Colliers is an adequate choice of broker and questions the Trustee's diligence in selecting Brokers, arguing that the Trustee "simply rubber-stamped [the Creditors'] choice of broker." (*Id.* ¶ 31.)

SRZ objects to the $18 million Strike Price on the basis that it would chill competitive bidding. (SRZ Obj. at 2.) According to SRZ, the Proponents arrived at the Strike Price by taking into account certain assumptions regarding the amount, validity, and priority of Kriti's claims and the liabilities of ARP II; however, the Strike Price should not be approved unless the Court is satisfied that the Trustee sufficiently performed diligence and a review of the validity of these assumptions. (*See id.* at 3.) Additionally, SRZ requests that the deadline to vote on the Plan and the deadline to object to the Plan be set on a date that is at least seven days after the date on which the Trustee files notice of the auction results so that creditors are provided sufficient time to make an informed decision with respect to the Plan. (*Id.*)

### F. The Hearing

The Court held an evidentiary hearing on the motions on July 7, 2015. The Trustee was the only witness called to testify. The Trustee's uncontroverted testimony established that the

Marina Property would need to be sold at a minimum amount of $18 million before Emerald could possibly receive any distribution on account of its membership interest in ARP II.[12] In the event the Marina Property could not be sold at such a price, the Trustee testified that he might seek to abandon Emerald's ARP II interest because he would consider it of de minimis value.

The Trustee testified about Colliers's previous and current work performed marketing the Marina Property. According to the Trustee, Colliers performed necessary diligence regarding environmental, conceptual, zoning, and soil testing issues. Colliers also prepared an offering memorandum for the sale of the Marina Property. This offering memorandum and the diligence information will be added to a data room Colliers proposes to establish, and potential bidders who execute a confidentiality agreement will be provided access to this data room. The Trustee also testified about his consideration of alternative brokers, indicating that he spoke with three other real estate brokers before the hearing, including a real estate broker suggested by Longman.

On cross-examination, counsel to the Longman Trust asked the Trustee how he determined that the Sale Procedures provide an adequate period of time to market the Marina Property. The Trustee testified that the three alternative brokers he considered advised him that a marketing period of 90–120 days is appropriate. However, the Trustee concluded that the 75-day marketing period contemplated under the Sale Procedures is sufficient in light of the considerable past and present work performed by Colliers. Counsel to the Longman Trust also questioned the Trustee about the value of the Marina Property.[13] The Trustee testified that, based on his discussions with potential brokers, he estimated that the Marina Property was worth

---

[12] At the prior July 1 hearing, a lawyer for SRZ acknowledged that unless a sale of the Property yielded a price in excess of $18 million, SRZ would not recover anything on its unsecured claim.

[13] Longman has previously asserted that the Marina Property is worth more than $24 million in his declaration in support of Emerald's objection to the Creditors' motion to dismiss or lift the automatic stay in Emerald's chapter 11 case. (*See* ECF Doc. # 26-1, ¶ 20.)

14

$17–22 million. The Trustee was shown an appraisal report of the Marina Property performed for ARP II on January 22, 2015 (the "2015 Appraisal," ECF Doc. # 23-12), which estimates the value of the property as $7.96 million. (*Id.* at 7.) When asked why he estimates the Marina Property to be worth considerably more than the estimate in the 2015 Appraisal, the Trustee stated that a number of important contingencies that needed to be addressed were reflected in the 2015 Appraisal's lower $7.96 million estimated value, including environmental, conceptual, zoning, and soil testing contingencies; however, Colliers has performed diligence on these issues, and this diligence information will be made available to potential bidders upon their execution of a confidentiality agreement.

## II.    DISCUSSION

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the trustee exercised sound business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 144–45 (2d Cir. 1992) (affirming bankruptcy court's approval of asset sale under section 363(b) because good business reason supported the sale); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1072 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (holding that the standard for approval of a motion under section 363 is whether there is a "good business reason" to support the motion).

The business judgment of a trustee is entitled to great deference. *See In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011). A trustee generally satisfies the business judgment standard if "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). "Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross negligence.'" *Borders*, 453 B.R. at 482 (quoting *Integrated Res.*, 147 B.R. at 656).

The Court concludes that the Trustee established that he exercised his sound business judgment in determining to proceed with a sale of the Marina Property under the terms of the Sale Procedures.[14] Based on the testimony at the evidentiary hearing, the Court finds that the Trustee considered options for realizing any potential value of Emerald's non-voting membership interest in ARP II and has articulated a good business reason why a sale of the Marina Property along the terms proposed is the preferred alternative; namely, that Emerald is more likely to receive a benefit on account of its interest in ARP II under the Sale Procedures than it would under a foreclosure sale of such interest proceeding under South Carolina law.[15] The Trustee's testimony further established that he conducted a reasonable investigation of the circumstances regarding a sale of the Marina Property, including in making his determination that: (1) the Strike Price reflects a reasonable balance of the need to obtain Kriti's approval for the sale and the goal of maximizing the participation of potential bidders; (2) that Colliers is an

---

[14] The recitation of facts in this section of the Opinion represents the Court's findings of fact pursuant to Federal Rule of Bankruptcy Procedure 7052 based on the evidence presented at the July 7 evidentiary hearing.

[15] As indicated above, the Debtors filed these chapter 11 cases on the eve of a scheduled foreclosure sale of Emerald's membership interest in ARP II. If a sale of the Marina Property is unsuccessful, the likely result may be lifting the automatic stay to permit the South Carolina foreclosure sale to proceed.

16

adequate broker to retain in light of their familiarity with the Marina Property and their considerable efforts marketing the property to date; and (3) the Sale Procedures and the Marketing Plan foster legitimate bids for the property and provide an adequate amount of time to market the Property to potential bidders, including by providing such bidders with access to diligence information.

The Longman Trust and the Trustee dispute how much time is required to market the Marina Property and whether it should be sold on an as-is, where-is basis.  The Court concludes that the terms of the Sale Procedures are appropriate, particularly since the Debtors have few funds available to further finance their chapter 11 cases.  While the parties also dispute the value of the Marina Property, the Court finds that a market test through a sale process represents the best procedure to determine its value.

The Longman Trust argues that the Sale Procedures engender a *sub rosa* plan of reorganization by dictating the terms of a chapter 11 plan of reorganization.  However, the Court is not resolving any party's entitlement to distributions of sale proceeds at this time.  If a sale of the Marina Property is successful, proceeds of the sale will be held in escrow pending a later determination of how they will be distributed pursuant to a confirmer chapter 11 plan, unless the case is converted to case under chapter 7.

**CONCLUSION**

For the foregoing reasons, the Court overrules the two objections and **GRANTS** the Sale Procedures Motion and the Broker Application. The Trustee shall submit to the Court a proposed form of order granting the Sale Procedures Motion, which shall be revised to provide that the deadlines to vote and object on the Plan are set at a date no later than seven days after the date on which the Trustee files a notice of results of the auction (if it is held).[16]

**IT IS SO ORDERED.**

Dated: July 10, 2015
New York, New York

_/s/ Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge

---

[16] The Trustee has already submitted to Chambers a proposed form of order granting the Broker Application, which indicates that the UST has no objection.