**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

In re:                                                          **NOT FOR PUBLICATION**

ASHLEY RIVER CONSULTING, LLC,                                   Chapter 11
                                                                Case No. 14-13406 (MG)

                          Debtor.

----------------------------------------------------------------X

In re:
                                                                Chapter 11
EMERALD INVESTMENTS, LLC,                                       Case No. 14-13407 (MG)

                          Debtor.

----------------------------------------------------------------X

## MEMORANDUM OPINION OVERRULING
## DISCLOSURE STATEMENT AND CONFIRMATION OBJECTIONS

*A P P E A R A N C E S:*

WHITE & WOLNERMAN, PLLC
*Attorney for the Gayla Longman Family*
*Irrevocable Trust*
950 Third Avenue, 11th Floor
New York, New York 10022
By:     David Y. Wolnerman, Esq.

EMMET, MARVIN & MARTIN, LLP
*Attorneys for Kriti Ripley, LLC and*
*Ashley River Properties II, LLC*
120 Broadway, 32nd Floor
New York, New York 10271
By:     Thomas A. Pitta, Esq.

GAZES LLC
*Counsel for Ian J. Gazes, as Trustee for*
*Emerald Investments, LLC and Ashley River*
*Consulting, LLC*
151 Hudson Street
New York, New York 10013
By:     Ian J. Gazes, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, New York 10014
By:     Richard C. Morrissey, Esq.
        Trial Attorney

SCHULTE ROTH & ZABEL LLP
*Attorney for Schulte Roth & Zabel LLP*
919 Third Avenue
New York, New York 10022
By:     Karen S. Park, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

The Court is asked to (i) approve the disclosure statement (the "Disclosure Statement,"

ECF Doc. # 59), and (ii) confirm the first amended joint plan of liquidation (the "Plan," ECF

Doc. # 94) filed by Ian. J. Gazes (the "Trustee"), Kriti Ripley, LLC ("Kriti"), and Ashley River

Properties II, LLC ("ARP II," and together with Kriti, the "Creditors," and the Creditors together

with the Trustee, the "Proponents").[1]  A combined hearing on the Disclosure Statement and Plan

was held on October 14, 2015 (the "Hearing").  The Proponents submitted a memorandum in

support of Plan confirmation (the "Supporting Memorandum," ECF Doc. # 94), which asserts,

among other things, that the Proponents have met all of the requirements of the Bankruptcy Code

to confirm the Plan.  Along with the Supporting Memorandum, a supporting declaration by the

Trustee was admitted in evidence without objection (the "Gazes Declaration," ECF Doc. # 96).

Additionally, received into evidence without objection were the (i) *Declaration of Davidson*

*Williams, Managing Member, Kriti Ripley, LLC in Support of Motion of Kriti Ripley, LLC and*

*Ashley River Properties II, LLC for an Order (A) Dismissing the Debtors' Cases or, in the*

---

[1]      All citations to docket entries in this opinion refer to the docket of Case No. 14-13407.

*Alternative, (B) Granting Relief from the Automatic Stay* (the "Williams Dismissal Declaration,"

ECF Doc. # 23), (ii) *Declaration of Davidson Williams in Support of Motion for Order*

*Approving Marketing, Bidding and Sale Procedures in Connection with Joint Plan of*

*Liquidation* (the "Williams Debt Declaration," ECF Doc. # 61) and (iii) *Chapter 11 Trustee's*

*Report of Bidding and Sale for Marina Property* (the "Trustee Auction Report," ECF Doc. # 91).

      The Gayla Longman Family Irrevocable Trust ("Longman Trust") objected to the

Disclosure Statement and confirmation of the Plan (the "Longman Trust Objection," ECF Doc. #

97)—which Schulte Roth & Zabel LLP ("SRZ") joined (the "SRZ Joinder," and together with the

Longman Trust Objection, the "Objection," ECF Doc. # 101).  The Longman Trust contends that

the Plan cannot be confirmed because it fails to satisfy section 1129(a)(10) of the Bankruptcy

Code which requires that a plan with one or more impaired classes contain at least one impaired

accepting class.  The Longman Trust argues that the Plan's accepting class, Class 1,

inappropriately contains both the secured and deficiency claims of Kriti.  If Class 1 only

contained the secured portion of Kriti's claim—which Longman contends that it should—Class 1

would be unimpaired because Kriti will receive its collateral by operation of the Plan.  With

respect to the Disclosure Statement, the Longman Trust contends that it should not be approved

because it fails to provide "adequate information" required by section 1125 of the Bankruptcy

Code.  In the Supporting Memorandum, the Proponents respond to the Longman Trust Objection,

arguing, among other things, that the classification of Kriti's entire claim in Class 1 is proper

because Kriti made a section 1111(b)(2) election; and Class 1 is impaired because Kriti has agreed

to pay the administrative claims of the chapter 11 cases, which will lessen its recovery.

Additionally, the Proponents argue the Disclosure Statement contains adequate information.

This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, and addresses the merits of the Objection. As more fully discussed below, the Court concludes that the Plan contains an impaired accepting class and that the Disclosure Statement contains adequate information. Accordingly, the Objection is **OVERRULED**.

The Court will enter a separate order confirming the Plan and approving the Disclosure Statement with findings of fact and conclusions of law on all other plan confirmation issues.

## I.    BACKGROUND

### A.    Debtors' Chapter 11 Cases

On December 15, 2014 (the "Petition Date"), Emerald Investments, LLC ("Emerald") and Ashley River Consulting, LLC ("ARC" and, together with Emerald, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. (Supporting Mem. ¶ 1.) On March 6, 2015, the Court granted the motion of the U.S. Trustee, and ordered the appointment of a chapter 11 Trustee. (ECF # Doc. 45.) The history of the misconduct of Stuart Longman, the trustee of the Longman Trust, and the reasons for appointment of a chapter 11 Trustee, are set forth in the Court's March 31, 2015 *Memorandum Opinion and Order Directing the Appointment of a Chapter 11 Trustee in These Chapter 11 Cases* ("Trustee Opinion ('Tr. Op.')," ECF Doc. # 54). Familiarity with the Trustee Opinion is assumed.[2] On March 18, 2015, the Court approved the appointment of Ian J. Gazes as chapter 11 Trustee. (ECF Doc. # 48.) No statutory committee has been appointed in these chapter 11 cases.

### B.    Ownership Structure of Debtors

Debtors ARC and Emerald are limited liability companies. (Tr. Op. at 3.) Emerald is wholly owned by the Longman Trust. (*Id.*) ARC is 80% owned by Emerald. (*Id.*) The other

---

[2]        Certain background facts are taken from the Trustee Opinion.

20% of ARC is owned by David A. Thomas ("Thomas"), who is the manager of each of the

Debtors. (*Id.*) Stuart Longman ("Longman") is the principal of each of the Debtors and is the

trustee of the Longman Trust. (*Id.*)

### C. Emerald's Relationship with Creditors

Kriti and Emerald formed ARP II in 2003 for the purpose of developing a marina and

condominiums (the "Marina Property") on a parcel of property in Charleston, South Carolina.

(Supporting Mem. ¶ 2.) Kriti and Emerald have at all times been the only members of ARP II.

(*Id.*; Tr. Op. at 3; Williams Dismissal Decl. ¶ 2.) Upon forming the non-debtor ARP II, Kriti and

Emerald entered into an operating agreement (the "Operating Agreement," or "OA," Williams

Dismissal Decl., Ex. A) which governs their relationship in ARP II. (Tr. Op. at 4.) Under the

Operating Agreement, Emerald made in-kind contributions, including the Marina Property, in

exchange for its 70% membership interest (the "Emerald Membership Interest"),[3] and Kriti

contributed $1.25 million in cash in exchange for the remaining 30% membership interest.

(Supporting Mem. ¶ 3.)

#### 1. Operating Agreement

The Operating Agreement provides that certain events, including the filing of a voluntary

petition for bankruptcy relief by one of the parties that is not dismissed within 90 days, triggers

the disassociation of ARP II. (OA § 10.1(b).) In the event of disassociation, the dissociating

member would be deemed to have made an offer of its membership interest to ARP II, and if

ARP II did not accept this offer by written notice within thirty days, the offer would be deemed

rejected. (OA § 11.3(a).) The non-disassociating member would then have the opportunity to

purchase the disassociating member's interest under the same terms as was offered to ARP II.

---

[3]     On December 31, 2014, ARP II had long-term liabilities exceeding $14.4 million (Williams Debt Decl. ¶
3.) ARP II's only meaningful assets consist of the Marina Property, and the improvements thereon, and the
Judgment (as defined below). (Supporting Mem. ¶ 9.)

(OA § 11.3(a).)  The purchase price of the membership interest upon disassociation would be determined by the "Appraised Value" of the membership interest, which requires the calculation of the "Fair Market Value," defined as:

> The cash equivalent price at which property would change hands between a hypothetical willing buyer and a hypothetical willing seller, neither being under the compulsion to buy or sell and both having reasonable knowledge of relevant facts.  The hypothetical buyer and seller are assumed to be able, as well as willing, to trade and are assumed to be well-informed about the property and concerning the market for such property.

(OA § 11.3(b).)  The parties each retain their own appraiser and if the parties' appraisers cannot agree on the Appraised Value, the parties would retain a third appraiser and the Appraised Value would be determined by the average of the two appraisals that are closest in price.  (OA § 11.3(b).)

### 2.    *Dispute between Emerald and Kriti*

Emerald and Kriti have been in a dispute relating to the Operating Agreement and the Marina Property for over nine years.  (Tr. Op. at 5.)  According to Kriti, after Kriti paid $1.25 million for its 30% interest in ARP II, Emerald and Longman diverted and misappropriated those funds.  (*Id.*)  On October 31, 2015, an arbitration panel in New York issued an award that found, among other things, that Emerald and Longman violated the Operating Agreement:

- "by wrongfully making payments of ARP II which were not on the approved marina budget or on the budget for future phases of the project or otherwise approved by Kriti";

- "by making payments to or for the benefit of Longman or other entities Longman controlled, which were totally unrelated to ARP II";

- "by failing to disclose that Sapphire Development, LLC [another entity owned by Longman that entered into agreements regarding neighboring property] had filed a petition in bankruptcy before execution of the Operating Agreement"; and

- "by diverting $150,000 of Marshall loan proceeds and paying themselves instead of paying [the marina.]"

(Tr. Op. at 5.)  As a result of this conduct, the arbitration panel held that Emerald forfeited all voting interests in ARP II, but maintained its 70% ownership interest otherwise.  (*Id.*)  In February 15, 2008, the Supreme Court of New York (the "New York State Court") affirmed this arbitration award and a separate June 22, 2006 arbitration award of damages to Kriti.  (*Id.* at 6.) The New York State Court issued a money judgment against Longman and Emerald, jointly and severally, in favor of Kriti and ARP II in the amount of $1,184,581.72 on March 27, 2008.  (*Id.*) This judgment, which remains unsatisfied, now exceeds $1.7 million, with post-judgment interest (the "Judgment").  (Supporting Mem. ¶ 5.)

On October 17, 2008, the Ninth Judicial Circuit sitting in Charleston, South Carolina issued a charging order perfecting a lien on Emerald's membership interest in ARP II for the Judgment.  (Tr. Op. at 6.)

On October 21, 2014, the Circuit Court entered an order requiring the foreclosure of Emerald's membership interest in ARP II to be conducted under South Carolina procedures for the foreclosure of real property rather than under procedures for the foreclosure of personal property.  (*Id.*)  The foreclosure of Emerald's membership interest was scheduled for December 16, 2014.  (*Id.*)  On December 15, 2014, the Debtors commenced these chapter 11 cases.  (*Id.* at 7.)

3.        *Bidding Procedures and Marketing of the Marina Property*

Upon his appointment, the Trustee took control of Emerald's 70% non-voting interest in ARP II.  To maximize the value of the illiquid non-voting interest, the Trustee investigated whether to pursue the disassociation rights first asserted by the Longman Trust and Emerald.  The Trustee quickly grasped the impediments to achieving value from this 70% interest, with or without voting rights.  The Trustee correctly recognized that the value of all voting and non-voting membership interests depended on the underlying value of the Marina Property.  After more than nine years of acrimony and litigation, the Trustee concluded that the best way to unlock the value of the Marina Property was to market and sell the property, free of all liens, claims and encumbrances.  That approach could only be accomplished with the agreement of Kriti.  After an appropriate investigation of the facts and circumstances, in the exercise of his business judgment, the Trustee concluded that the best course of action was to withdraw without prejudice the notice of disassociation previously served by Longman, and to negotiate with Kriti for the marketing and sale of the Marina Property.  The Trustee also correctly concluded, based on his analysis of all of the claims in the cases, that the Marina Property would have to sell for more than $18 million for any creditors other than Kriti to recover any distributions from the Debtors' estates.  Indeed, SRZ, the largest unsecured creditor in these cases, confirmed its agreement, before approval of the bidding procedures and again during the confirmation hearing, that the Marina Property had to sell for more than $18 million for unsecured creditors to receive any recovery.  (Hr'g Tr. on Mot. of Kriti Ripley, LLC, Ashley River Properties II, LLC, and Ian J. Gazes, as Trustee for Emerald Investments, LLC and Ashley River Consulting, LLC, for Order Approving Marketing, Bidding and Sale Procedures in Connection with Joint Plan of Liquidation at 53, ECF Doc. # 80; Hr'g Tr. at 14.)  And if the unsecured creditors received no recovery, the

holders of equity, including Emerald and, ultimately, the Longman Trust, would receive no

recovery.  If Longman's declaration testimony before the appointment of the chapter 11 Trustee

was correct that the Marina Property was worth $30 million (*see Declaration in Support of*

*Debtors' Objection to Motion of United States Trustee for the Entry of an Order Directing the*

*Appointment of a Chapter 11 Trustee*, ECF Doc. # 43-1), marketing and sale of the Marina

Property was the best method to maximize the estates' property.  That would be true whether

Emerald had a 70% non-voting interest in ARP II, or, if Emerald's vote could be restored in ARP

II, a 70% voting interest.  So the Trustee negotiated an agreement with Kriti for marketing and

sale of the Marina Property.  The agreement of the Trustee and Kriti to market and sell the

Marina Property was set forth in proposed bidding procedures that were approved by the Court,

over the frankly frivolous objection of the Longman Trust.  *See Memorandum Opinion and*

*Order Granting (I) Motion for Approval of Sale Procedures, and (II) Application to Retain*

*Broker*, dated July 10, 2015 (ECF Doc. # 77) ("In light of the lengthy history of obstruction and

misconduct on the part of Longman, the Court views the Longman Trust's objections with a

healthy degree of skepticism.  The issue before the Court is whether the Trustee has exercised his

sound business judgment in seeking approval of the proposed bidding procedures in connection

with a sale of the Marina Property; the Court concludes that he has.").  If the $18 million

minimum sale price, required before the estates and their unsecured creditors could receive any

recovery was not reached, the Trustee agreed as part of the proposed Plan, to relinquish to Kriti

Emerald's 70% non-voting interest in ARP II.  But if a sale had resulted from the marketing and

sale procedures, no determination was made about the distribution of sale proceeds, which

remained subject to confirmation of the proposed Plan.

Perhaps not surprisingly, and consistent with the most recent appraisals of the Marina Property, and contrary to Longman's fanciful and unsupported opinion of value, the marketing and proposed sale of the Marina Property proved unsuccessful. The highest bid received—full of non-qualifying conditions—was for $8.5 million. Under the proposed Plan, if confirmed, Emerald's non-voting interest will be turned over to Kriti.

### D.    Plan Confirmation and Disclosure Statement Objections

Longman and the Longman Trust have essentially objected to nearly everything that has occurred in these cases, attempting at every step of the way, to delay or slow down these proceedings. The Longman Trust now objects to both the Disclosure Statement and Plan confirmation. SRZ, the largest unsecured creditor in these cases by virtue of unpaid legal fees for representing Longman in his earlier unsuccessful efforts in the arbitrations and judicial proceedings confirming the arbitration awards, joins in part in the Longman Trust objection. The Longman Trust argues that Plan confirmation should be denied because there is no impaired accepting class. The Longman Trust also contends that the Disclosure Statement fails to provide: (i) any discussion regarding Emerald's rights in the event of a disassociation and (ii) any discussion regarding the value of ARP II.

#### 1.    *Longman Trust Objection to the Disclosure Statement*

The Longman Trust argues that the Disclosure Statement provides no description of the disassociation process Emerald attempted to set in motion prior to the Trustee's appointment, no discussion regarding the benefits that Emerald believed could be obtained for creditors through the disassociation process, no discussion of the Trustee's withdrawal of the disassociation notice, and no discussion why the Trustee never attempted to pursue the disassociation process to maximize creditor recoveries. (Longman Trust Obj. at 4–5.) The Longman Trust contends that

Article X of ARP II's Operating Agreement provides that a bankruptcy filing by Emerald that is not dismissed within 90 days after its commencement is an "Event of Disassociation."  (*Id.* 5.) In turn, the Longman Trust contends that Emerald's right to be compensated for its "Membership Share" potentially provides a mechanism by which the Trustee could re-instate the voting rights lost by Longman, thereby allowing the estates to realize the "true" value of its controlling 70% ownership interest in ARP II for the benefit of all creditors and parties in interests.  (*Id.* at 5–6.) The Longman Trust contends that the Disclosure Statement's silence prevents parties-in-interest from making informed decisions whether or not to vote in favor of the Plan.  (*Id.* at 6.)  But because only Class 1 (Kriti) will receive any distribution under the Plan, all other classes of creditors or interests are presumed to reject the Plan, so no votes in favor of the Plan were influenced by anything said or not said in the Disclosure Statement.

Second, the Longman Trust contends that the Disclosure Statement lacks any discussion about the value of ARP II or the Debtor's 70% interest in it.  (*Id.* at 7.)  The Longman Trust highlights its prior submissions to the Court referencing previous appraisals of ARP II's property ranging from $17.25 to $24.54 million.  (*Id.*)  The Longman Trust contends that the property has not been re-appraised to reflect, among other things, the recovery of the real estate market and the additional capacity of the marina.  (*Id.*)  Specifically, the Longman Trust contends that prior appraisals were based on ARP II's ownership of 87 wet slips; since then, however, ARP II received a permit to add an additional 187 wet slips, and the prior appraisals do not reflect the additional value resulting from the permit granted to expand the marina.  (*Id.* at 7–8.) Additionally, the Longman Trust takes issue with the most recent appraisal of ARP II and Kriti, arguing, among other things, that it employed inappropriate methodologies.  (*Id.* at 8–9.)

2.    *Longman Trust Objection to the Plan*

The Longman Trust contends that Plan confirmation should be denied because there is no impaired accepting class. (*Id.* at 10.) The Longman Trust notes that the only accepting class will be Class 1 consisting of the Kriti Claims. (*Id.*) The Longman Trust contends that the Kriti Claims should be secured up to the value of Emerald's 70% interest in ARP II and its remaining claims are unsecured deficiency claims that should be classified as Class 2 General Unsecured Claims. (*Id.* at 11.)

The Longman Trust contends that where, as here, a creditor is entitled to the remedy of foreclosure in lieu of a legal claim for repayment of a debt, then any plan that gives such creditor title to collateral securing its claim leaves that claim unimpaired. (*Id.*) Accordingly, as ARP II and Kriti commenced a foreclosure sale (which was stayed as a result of the chapter 11 filing), the Plan's offer to give Emerald's 70% interest in ARP II to ARP II and Kriti leaves ARP II and Kriti's rights unaltered, thereby rendering Class 1 claims unimpaired. (*Id.*) Moreover, the Longman Trust argues that the classification of the ARP II and Kriti claims as Class 1 secured claims is an impermissible attempt to gerrymander an impaired accepting class. (*Id.* at 12.)

### E.    Proponents' Supporting Memorandum

With respect to the Longman Trust's objection that the Disclosure Statement lacks a description of the disassociation process, the Proponents explain that the Trustee analyzed the disassociation option shortly after his appointment and determined that disassociation served no purpose, as it would result in the Trustee continuing ownership of the Emerald Membership Interest. (Supporting Mem. at 30.) Therefore, shortly after his appointment as chapter 11 Trustee, Gazes withdrew the notice of disassociation without prejudice. Additionally, the

Proponents contend that disassociation would not reinstate the voting rights.  (*Id.* at 29.)

Discussion of disassociation would have been confusing and not relevant to the proposed Plan.

 With respect to the Longman Trust's objection that the Disclosure Statement lacks a

discussion of the value of ARP II or the Debtor's 70% interest in it, the Proponents contend that

the value of the Marina Property has been established through the marketing and sale process

(*Id.*)  The Proponents contend that the Marina Property is worth approximately $8 million—not

$24.5 million.  There is substantial evidence to support this valuation, including: (i) the

marketing process that the Trustee just conducted resulted in a high bid of $8.5 million; (ii) an

appraisal completed on January 31, 2015 concluded that the Marina Property had a current value

of $7.96 million; (iii) a marketing process conducted during 2014 resulted in proposals ranging

from $6.3 million to $9.3 million; and (iv) the three most recent appraisals conducted prior to the

Petition Date found that the Marina Property was decreasing in value even after absorbing the

impact of the 2009 market collapse.  Between October 2009 and July 2012, three appraisals

suggested that the value of the Marina Property ranged from a high of $17.25 million to a low of

$8.7 million.  (*Id.* at 30–31.)

 With respect to the Longman Trust's argument that Kriti's claim is unimpaired and thus

cannot support cram down of the Plan—*i.e.,* the lack of an impaired accepting class—the

Proponents contend that Kriti possessed a secured claim and made an election pursuant to section

1111(b)(2) of the Bankruptcy Code to have its entire claim treated as a secured claim.  (*Id.* at

19.)  Because the Plan provides that Kriti has agreed to fund payment of the administrative

claims, Kriti's recovery is eroded and Kriti's claim is impaired.  (*Id.* at 20.)  Even if the Kriti

Claims would otherwise be unimpaired because of its retention of the collateral, such retention of

collateral will come "at a significant cost" to Kriti.  (*Id.*)  The Proponents distinguish *In re 183*

*Lorraine St. Assocs.*, 198 B.R. 16 (Bankr. E.D.N.Y. 1996), cited by the Longman Trust for the

proposition that a secured creditor retaining its collateral is not impaired.  (*Id.*)  The court in

*Lorraine* stated that the secured creditor in that case would be impaired if the secured creditor

retained its collateral under the plan but the debtor retained $5,000 to satisfy other creditors'

claims.  Here, of course, the secured creditor is funding administrative claims far exceeding

$5,000.  Therefore, *Lorraine* is not an impediment—and, indeed, supports—the Court

determining that Kriti is impaired.  (*Id.*)

### F.    The Hearing

At the Hearing, the Trustee offered testimony on several issues, including, among others,

the Trustee's decision to withdraw the notice of disassociation without prejudice, ARP II or

Emerald's 70% interest therein and whether the Plan contained an impaired accepting class.

The Trustee testified that Emerald, at the direction of Longman, served a disassociation

notice under the Operating Agreement upon Kriti.  (Hr'g Tr. at 23.)  The Trustee testified that he

researched his ability to resurrect Emerald's voting rights by pursuing the disassociation—

examining, among other things, cases, the arbitration award, historical data and the Operating

Agreement.  (*Id.* at 24.)  The Trustee testified that since the equity in ARP II was junior to the

debts of ARP II, if an appraiser had valued the underlying Marina Property at $8 million,

Emerald would not be entitled to anything under the disassociation process because the debt of

ARP II exceeded the $8 million appraisal, rendering its membership interest worthless.  (*Id.* at

29–30.)  The Trustee testified that in the course of his investigation, he found no "semblance of

any evidence" that any provision of the Operating Agreement, including the disassociation

provisions, could serve to resurrect the voting rights of Emerald.  (*Id.* at 30.)  Further, the Trustee

testified that even if disassociation were to reinstate the voting rights of Emerald, the 70% voting

interest in ARP II would be of no value to the estates.  Specifically, the Trustee stated that it would be unlikely that a third party would want to become a member of Emerald—thereby entering into a partnership with an unknown party in an underwater venture—and become saddled with a $14 to $18 million debt load subject to an immense capital contribution loss.  (*Id.*) On cross-examination, the Trustee reiterated this position.  (*Id.* at 46.)

The Trustee testified that due to the time constraints and lack of funds for payment of a new appraisal (in addition to many appraisals having already been done), the Trustee elected to withdraw the notice of disassociation without prejudice in order to spend more time reviewing whether the resurrection of the voting rights that were stripped from Emerald was even possible. (*Id.* at 24.)  The Trustee testified that he concluded that the disassociation process would not resurrect Emerald's voting rights and the best way to determine the value of the property was to ask Kriti to authorize the Trustee to sell the property in its entirety.  (*Id.* at 24–25.)  In that vein, rather than seeking to reinstate the disassociation notice, the Trustee began negotiations with Longman and then Kriti.  (*Id.* at 67.)

In testing the market price of the Marina Property, the Trustee testified that he reviewed the debt allocations and determined that the sale needed to be at least $18 million to cover the debt of ARP II.  (*Id.* at 25.)  The Trustee testified that he advertised the property with an asking price of $18 million.  (*Id.*)  It was never publicly revealed that there was a reserve price of $18 million on the property.  (*Id.*)  By not disclosing that there was a reserve price of $18 million, any offers above or below $18 million were encouraged.  If a viable offer below $18 million was received, the Trustee could have negotiated with Kriti for a different split of the purchase price; but the only bid, with unacceptable conditions, was $8.5 million, far below what was needed to pay the secured claim, with nothing available for unsecured creditors or equity.

With respect to claim impairment, the Trustee testified that Kriti agreed to fund all of the chapter 11 administrative expenses.  (*Id.* at 49.)  The Trustee testified that he believed the total administrative expenses in the chapter 11 cases to be in excess of $90,000.  (*Id.*)  The contribution promised by Kriti is significantly greater than the contribution offered in the *Loraine* case and, therefore, Kriti's claim is significantly impaired.  (*Id.* at 50.)

## II.    DISCUSSION

### A.    The Disclosure Statement is Adequate

Under section 1125 of the Bankruptcy Code, a disclosure statement contains "adequate information" if it contains

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).  Congress purposely left vague the standard for judging what constitutes adequate information to allow the Court to make a case-by-case determination:

> The flexibility in the standard comes primarily in the use of the phrase "investor typical of holders of claims or interests of the relevant class." That phrase is further defined to develop the idea that the disclosure required depends on the circumstances of the case, the relative sophistication of the creditors, and their access to other sources of information about the plan. For example, trade creditors will not need the same level of disclosure as public debenture holders or stockholders, and the section reflects the desired flexibility. The section also permits a certain amount of flexibility based on the condition of the debtor and of his books and records. Frequently, the debtor's books will be in shambles at the time of bankruptcy, and reconstruction could be a long and costly process. If there is no need for the information under the circumstances, reconstruction may be dispensed with, and certified audited financial statements will not be required. Such a

> requirement in every case could doom many reorganizations to
> failure-because the books and records are so inadequate as to
> preclude preparation and certification of audited financial
> statements. The court will take all of these factors into
> consideration in determining the adequacy of disclosure in a
> particular case, consistent with the policy of the statute to require
> "adequate information."

H.R. Rep. No.95–595, 95th Cong., 1st Sess. 225, 409 (1977).

However, section 1125 of the Bankruptcy Code provides some guidance to the Court,

stating it shall consider "the complexity of the case, the benefit of additional information to

creditors and other parties-in-interest, and the cost of providing additional information" when

determining if a disclosure statement provides adequate information. 11 U.S.C. § 1125(a)(1).

Under section 1125 and its legislative history, courts have held that

> a disclosure statement must contain all pertinent information
> bearing on the success or failure of the proposals in the plan of
> reorganization. A disclosure statement should likewise contain all
> material information relating to the risks posed to creditors and
> equity interest holders under the proposed plan of reorganization.
> The disclosure statement, on the other hand, should not be
> burdened with overly technical and extremely numerous additions,
> where such information would serve only to diminish the
> understanding of a typical creditor or interest holder.

*In re Cardinal Congregate I*, 121 B.R. 760, 765–66 (Bankr. S.D. Ohio 1990) (citations and

internal quotation marks omitted). Furthermore, a disclosure statement is intended to be a source

"of factual information upon which one can make an informed judgment about a reorganization

plan," and not "an advertisement or a sales brochure." *In re Eagan*, 33 B.R. 672, 676–76 (Bankr.

N.D. Ill. 1983). Accordingly, "disclosure statements must contain factual support for any

opinions contained therein since opinions alone do not provide the parties voting on the plan

with sufficient information upon which to formulate decisions." 10 COLLIER ON BANKRUPTCY

¶ 1125.02[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Other courts have created a non-exhaustive list of factors that should be disclosed, with

the qualification that "[d]isclosure of all factors is not necessary in every case." *In re Metrocraft*

*Publ'g Servs.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  The factors are:

> (1) the events which led to the filing of a bankruptcy petition; (2) a
> description of the available assets and their value; (3) the
> anticipated future of the company; (4) the source of information
> stated in the disclosure statement; (5) a disclaimer; (6) the present
> condition of the debtor while in Chapter 11; (7) the scheduled
> claims; (8) the estimated return to creditors under a Chapter 7
> liquidation; (9) the accounting method utilized to produce financial
> information and the name of the accountants responsible for such
> information; (10) the future management of the debtor; (11) the
> Chapter 11 plan or a summary thereof; (12) the estimated
> administrative expenses, including attorneys' and accountants'
> fees; (13) the collectability of accounts receivable; (14) financial
> information, data, valuations or projections relevant to the
> creditors' decision to accept or reject the Chapter 11 plan; (15)
> information relevant to the risks posed to creditors under the plan;
> (16) the actual or projected realizable value from recovery of
> preferential or otherwise voidable transfers; (17) litigation likely to
> arise in a nonbankruptcy context; (18) tax attributes of the debtor;
> and (19) the relationship of the debtor with affiliates.

*Id.* (citations omitted); *see also In re Phoenix Petroleum*, 278 BR 385, 406 n.6 (Bankr. E.D. Pa.

2001); 10 COLLIER ON BANKRUPTCY ¶ 1125.02[2] at 1125.

### 1.    *Disclosure was Adequate*

At the outset, the Court notes that the argument that the disclosure was inadequate—

because it lacks a fulsome discussion of Emerald's rights in the event of a disassociation and the

value of ARP II—gains little traction.  The parties-in-interest were well aware of all of the

circumstances of these cases and they all played active roles.  Additionally, it strains credulity

that the Longman Trust would have benefited from additional information as the Longman Trust

was the driving force of the Debtors until the Trustee was appointed.  Indeed, as evidenced by

the Longman Trust's arguments at the Hearing and in its objection to the Disclosure Statement,

its position was well-formed on these issues.  Specifically, a more robust description of

Emerald's disassociation rights in the Disclosure Statement was unnecessary because such rights

were not relevant to class distributions because they were worthless, as Proponents established

and the Trustee convincingly testified to.  Additionally, as the Hearing demonstrates, the

Longman Trust had well developed views on the value of ARP II.  And as to the unsecured class,

it voted to reject the Plan since SRZ voted its unsecured claim against the Plan.  (Gazes Decl. ¶

9.)

> 2.    *The Trustee's Actions in Withdrawing Notice of Disassociation and
> Exposing the Marina Property to the Market are Entitled to Deference*

With respect to the substantive thrust of the Longman Trust Objection to the Disclosure

Statement—that there was value in the notice of disassociation which the Trustee withdrew

without prejudice and that ARP II was not properly valued—the Court concludes that they are

both without merit.

The business judgment of the estate representative is entitled to great deference.  *See In

re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011) ("Indeed, the trustee or DIP is

entitled to great judicial deference in deciding which bid to accept as the best and highest bid on

the sale of the Debtor's assets." (internal citation and quotation marks omitted)).  A debtor

generally satisfies the business judgment standard if "the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)

(quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Courts should not generally

interfere with business decisions absent a showing of "bad faith, self-interest, or gross

negligence."  *Id*.

Here, the Trustee has convincingly demonstrated that he acted on an informed basis, in good faith with the honest belief that the action he took—rescinding the notice of disassociation without prejudice—was in the best interest of the Debtors, thereby entitling the Trustee's actions to deference.  The Trustee testified to his thorough due diligence process with respect to the disassociation process, researching whether it was possible to resurrect Emerald's voting rights and found no "semblance of any evidence" that any provision of the Operating Agreement could serve to resurrect the voting rights of Emerald.  (Hr'g Tr. at 30.)  Given time constraints and a lack of funds for payment of the appraisal processes, the Trustee withdrew the notice of disassociation and initiated negotiations with Kriti (whose consent was needed) to market the Marina Property (and not just Emerald's indirect 70% interest therein).  (*Id.* at 24–25, 67.)

Additionally, with respect to valuing ARP II, the Trustee's actions are also entitled to deference.  The Trustee negotiated with Kriti to be able to market the Marina Property and not just Emerald's 70% indirect interest therein, given the anticipated difficulties of marketing Emerald's 70% indirect interest in ARP II (which the Trustee testified to).  (*Id.* at 30.)  Further, to protect the sale price of the Marina Property, the Trustee established an unpublicized $18 million reserve price.  (*Id.* at 25.)  The Court finds that the marketing process was robust, and was the best means for determining whether the Marina Property had a fair market value in excess of $18 million, the amount needed for any creditors (other than Kriti) or equity to receive anything from a sale.

Accordingly, the Court finds and concludes that Trustee's actions, withdrawing the notice of disassociation and marketing the Marina Property, are entitled should deference—the Trustee exercised good faith business judgment in withdrawing the notice of disassociation without prejudice to negotiate with Kriti to market the Marina Property and not just Emerald's indirect

interest therein.  The Trustee reasonably concluded based on evidence before him that for the

estates to recover value, the property had to sell for over $18 million based on the liabilities of

ARP II.

### B.     The Plan Includes an Impaired Accepting Class

Section 1129 of the Bankruptcy Code requires at least one class of impaired creditors—if

there are any impaired creditors—to have accepted the proposed Plan.  *See* 11 U.S.C. §

1129(a)(10).  Significantly, the Bankruptcy Code does not permit the cramdown of a plan that is

not accepted by even one impaired class.  *In re RYYZ, LLC*, 490 B.R. 29, 39 (Bankr. E.D.N.Y.

2013).  As at least one court explained, section 1129(a)(10) "ensures that prior to 'embarking

upon the tortuous path of cramdown and compelling the target of cramdown to shoulder the risks

of error necessarily associated with a forced confirmation,' there is a showing that some group

hurt by the plan favors the plan."  *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760

(Bankr. S.D.N.Y. 1995) (quoting *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1020 (Bankr.

S.D.N.Y. 1993), *aff'd*, No. 93 CIV. 844 (LJF), 1993 WL 316183 (S.D.N.Y. May 21, 1993)).

Additionally, "[t]here must be a manifestation of creditor support for the proposed plan before a

court should even consider the merits of the proposed plan."  *Id.*  In that vein, section

1129(a)(10) acts as a "statutory gatekeeper barring access to cram down where there is absent

even one impaired class accepting the plan."  *In re 266 Wash. Assocs.*, 141 B.R. 275, 287

(Bankr. E.D.N.Y.), *aff'd sub nom.*, *266 Wash. Assoc. v. Citibank, N.A. (In re Wash. Assocs.)*, 147

B.R. 827 (E.D.N.Y. 1992).

An election under section 1111(b)(2) of the Bankruptcy Code allows an undersecured

creditor to be treated as fully secured under a plan of reorganization that provides for a debtor's

retention of the lienholder's collateral.  *680 Fifth Ave. Assocs. v. Mut. Benefit Life Ins. Co. in*

*Rehabilitation*, 156 B.R. 726, 733 (Bankr. S.D.N.Y. 1993), *aff'd*, 169 B.R. 22 (S.D.N.Y. 1993), *aff'd*, 29 F.3d 95 (2d Cir. 1994).  An undersecured creditor may make the section 1111(b)(2) election only if the collateral is not of inconsequential value and (if the creditor is a recourse creditor) the collateral is not sold under section 363 of the Bankruptcy Code or under the plan of reorganization.  *Id.*  Normally, a creditor making an election under section 1111(b)(2) of the Bankruptcy Code forfeits its right to vote on a plan because it relinquishes its undersecured deficiency claim and its secured claim is unimpaired because the creditor must be paid the full amount of his claim over time, so long as the present value of such payments equals the value of the collateral.  *See id.*; *Wade v. Bradford*, 39 F.3d 1126, 1129 (10th Cir. 1993) (citations omitted).

In *In re 183 Lorraine Street Associates*, the court observed that a plan would leave a claim unimpaired where the plan proposed to give the secured creditor its collateral and the secured creditor would have otherwise been entitled to exercise the equitable remedy of foreclosure in lieu of a legal claim for the face amount of the debt it was owed.  198 B.R. 16, 19 (Bankr. E.D.N.Y. 1996) (citing 11 U.S.C. § 1124(1) (A claim is unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest")).  However, the court in *Lorraine* also concluded that a secured creditor that would receive less than it was entitled to under a plan (by virtue of a $5,000 deposit for the benefit of unsecured creditors) would be impaired notwithstanding receiving its collateral under the plan.  *See id.*

### 1.    *Kriti's Claim was Properly Classified in Class 1*

Kriti possesses an approximately $1.7 million dollar secured claim as of the Petition Date and made the election pursuant to section 1111(b)(2) of the Bankruptcy Code to have its entire

claim treated as a secured claim. (Supporting Mem. ¶ 55.) Given that Kriti made an section

1111(b)(2) election, the Plan's classification of Kriti's entire claim as a secured claim in Class 1

separate from the general unsecured claims in Class 2 was permissible. *See* 11 U.S.C. § 1122(a)

(Claims or interests may only be placed in a particular class if they are "substantially similar to

the other claims or interests of such class"); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R.

723, 757 (Bankr. S.D.N.Y. 1992) ("A plan proponent is afforded significant flexibility in

classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and

if all claims within a particular class are substantially similar." (internal citation omitted)).

Additionally, since Kriti made the section 1111(b)(2) election, it forfeited its deficiency claim,

obviating the need for its deficiency claim to be classified separately. *See In re D & W Realty*

*Corp.*, 165 B.R. 127, 129 (S.D.N.Y. 1994) (stating that, absent a section 1111(b)(2) election, a

secured claim cannot be classified with a deficiency claim). Hence, pursuant to Kriti's section

1111(b)(2) election, Kriti's secured claim was properly classified in Class 1.

## 2.    *Class 1 is an Impaired Accepting Class*

Here, Kriti has agreed to pay the administrative claims of the chapter 11 cases

(Supporting Mem. ¶ 56) and at the Hearing, the Trustee testified that he expects the

administrative claims to exceed $90,000. (Hr'g Tr. at 49.) Under the Plan, given that there will

be no sale of the Marina Property as there were no bids above the strike price of $18 million,

Kriti will receive the Emerald Membership Interest in full and final satisfaction of its claim.

(Supporting Mem. ¶ 16.) Longman Trust cites *Lorraine* for the proposition that a secured

creditor retaining its collateral under a plan is unimpaired. (Longman Trust Obj. ¶ 25.) The

Longman Trust argues that because the Plan offers Kriti the Emerald Membership Interest,

Kriti's rights are unaltered which renders Class 1 unimpaired. (*Id.*) The Longman Trust's

23

reliance on *Lorraine* is misplaced: *Lorraine* concludes that, notwithstanding a secured creditor retaining its collateral under a plan, if the secured creditor receives less than it was entitled (*i.e.* receiving its collateral less a $5,000 deposit for the benefit of creditors), then such creditor would be impaired. *See In re 183 Lorraine St. Assocs.*, 198 B.R. at 19. Neither the Longman Trust nor SRZ provided any authority supporting a different result. Under the Plan, Kriti is to receive less than it is entitled to because it will fund the administrative claims of the chapter 11 cases.

Since Kriti's claim was impaired by virtue of payment of the administrative claims and Kriti voted its claim in favor of the Plan thereby causing Class 1 to accept the Plan, the Plan has an impaired accepting class. (Gazes Decl. ¶ 9.)

## III.    CONCLUSION

For the foregoing reasons, the Objection is **OVERRULED**. With the other requirements to plan confirmation having been satisfied, a separate order confirming the Plan will be entered.

**IT IS SO ORDERED.**

Dated:  November 6, 2015
        New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge